Filed 10/15/13  P. v. Gonzales CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B241884 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. VA118581) |
| ANDREW JAMES GONZALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas I. McKnew, Judge.  Affirmed.

Raab|Mahoney, Michael G. Raab and Patrick T. Mahoney for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendant Andrew James Gonzales appeals from a judgment of conviction entered after a jury found him guilty of two counts of carjacking (Pen. Code, § 215, subd. (a)) and found true the allegations he personally used a firearm in the commission of the crimes (*id*., § 12022.53, subd. (b)). The trial court sentenced Gonzales to concurrent terms of 13 years in state prison on the two counts, consisting of the low term of 3 years plus 10 years on the firearm use enhancement.

Gonzales contends he received ineffective assistance of counsel based on his trial counsel's recommendation that he reject a plea offer. We conclude Gonzales has failed to meet his burden of showing ineffective assistance of counsel on appeal, and his contention is more appropriately raised on habeas corpus. We therefore affirm the judgment.

## FACTUAL BACKGROUND

A.    *The Carjacking*

At approximately 7:00 p.m. on February 7, 2011 Ruben Flores Molina, park patrol supervisor at Rose Hills Memorial Park, was clearing the park of visitors prior to closing when he noticed Gonzales hiding behind a trash can. Gonzales came out from behind the trash can and pointed a handgun at Flores Molina. Gonzales was wide-eyed and his mouth was open, but Flores Molina did not hear him say anything. Flores Molina drove to the main gate and asked his staff to call the Los Angeles County Sheriff's Department.

Adela Robledo and Raymundo Aguirre, maintenance workers at the park, had parked a Rose Hills truck near a restroom area. Aguirre was cleaning outside the building when Gonzales approached him and asked how many people were working there. Aguirre thought at first he was a police officer because he wanted information, and Aguirre told him there was a woman cleaning the restrooms. Gonzales then asked for the

2

keys but did not specify which keys. He pointed a gun at Aguirre and told him to call the woman. Aguirre called Robledo.

While Robledo was cleaning the restroom, she heard Aguirre talking to someone. When she came outside, she saw Gonzales talking to Aguirre, but she could not understand what they were saying because she did not speak English. Gonzales was getting angry and talking louder, and it appeared to Robledo that he was drunk or on drugs. Gonzales demanded the keys to the truck. Aguirre told him the keys were in the truck, but Gonzales did not believe him. Gonzales lost patience, pulled a gun from his waistband, and pointed it at Aguirre and Robledo. Gonzales said he was going to take one of them, got behind them, and walked them to the truck at gunpoint. Gonzales got into the truck, found the keys in the ignition, and started the engine. Robledo and Aguirre ran to safety, and Robledo called their supervisor to report the incident.

Deputy Sheriff Javier Azteca arrived at Rose Hills about 7:10 p.m. in response to a call about a possible attempted suicide. Other deputies arrived, and they waited at the main gate to the memorial park. About 15 minutes later, a truck driven by Gonzales approached the gate, moving at a high rate of speed. Gonzales had his left arm extended out the window and was pointing a gun in the direction of the deputies. Gonzales made a turn and lost control of the truck, which rolled and came to a stop about 25 feet from Deputy Azteca.

Deputy Jose Hernandez responded to a call about a person with a gun at Rose Hills. When he arrived, he received information that a truck had been stolen and was headed toward the main gate. A short time later, he saw the truck approaching and heard it accelerating down the hill. The truck was coming directly toward him, but then it veered away and rolled over. As the truck passed him, Deputy Hernandez saw an arm extended out the window with a gun pointed at the deputies.

Deputy Hernandez and other deputies approached the truck. Gonzales climbed out, cursing and making gun-like hand gestures. Gonzales complied with orders to keep his hands raised. Deputy Hernandez saw a gun in Gonzales' waistband. He took the gun and placed Gonzales under arrest. He observed that Gonzales smelled of alcohol and

appeared to be very intoxicated, although Gonzales was responsive and appeared aware of where he was.

        B.       *Testimony by Members of the Gonzales Family*

Gonzales' older sister, Crystal Marie Sampson, testified that she and Gonzales had been raised by a single mother[1] and lived with their mother, their grandparents, and their Chihuahua, Pinky. In 2003 their mother was diagnosed with breast cancer. Gonzales had difficulty watching their mother suffer, and he began drinking. Then in 2005 their grandfather died. Gonzales was devastated. His drinking increased, he was angry, and he did not want to be around anyone. One night he became very drunk and attempted to kill himself by drinking a bottle of detergent. Their mother took Gonzales to the emergency room, and he was placed on a 72-hour suicide watch.

In 2006 Sampson and Gonzales learned that their mother's cancer was terminal. Gonzales was distraught and continued drinking a lot. About this time, Sampson moved in with her fiancé, and Gonzales became their mother's primary caregiver. Gonzales stopped speaking to Sampson. Around this same time, Gonzales met and married his wife, Nicole, and they had two children. Gonzales' drinking decreased. In 2008, however, Gonzales' mother was hospitalized, and Gonzales' drinking increased again. While his mother was in the hospital, Pinky died, which upset Gonzales because his mother loved the dog like a child. Gonzales believed his mother would die soon because his mother had loved the dog so much.

Gonzales and Sampson were home with their mother when she died in May 2010. Gonzales was distraught and locked himself in his room. Sampson called Rose Hills to pick up their mother's body. When Gonzales came to the rosary, he was drunk and emotional. By January 2011 Gonzales was drinking heavily. He told Sampson and others that he did not want to stay in the family house because there were ghosts there.

---

[1]    Their mother separated from their father, Frank Gonzales, when the children were young.

4

On February 7, 2011 Nicole arrived home to find Gonzales on the bed, looking as though he had been crying. He went into the bathroom, where he cried for 15 to 20 minutes. Nicole hid the car keys because she did not want Gonzales driving. When Gonzales finally came out of the bathroom, he asked Nicole for the keys so he could go to Rose Hills to visit his mother. Nicole told him she did not want him to leave. Gonzales left anyway. When she looked for him, she saw that he had taken his grandmother's truck.

Nicole called Sampson to tell her she was concerned about Gonzales. Nicole spoke to Gonzales by phone, after which she went into the bedroom and found a suicide note. Nicole drove to Rose Hills. Sampson and her husband also drove to the cemetery and called 911 en route because Sampson believed Gonzales was going to hurt himself. Sampson and her husband met Nicole by the gravesites of Sampson and Gonzales' mother and grandfather, and saw their grandmother's truck. There was an empty vodka bottle in the cupholder and another empty bottle by the gravesites. Sampson and her husband went looking for Gonzales while Nicole stayed by the gravesites. Eventually the sheriff's deputies arrived and spoke to Nicole, and then to Sampson when she returned to the gravesites. When a radio call came in regarding the truck heading toward the main gate, the deputies went there with Sampson, her husband, and Nicole following.

Sampson also called her father, Frank Gonzales, who went to Rose Hills. He saw Gonzales driving the truck at a high rate of speed. Gonzales had both hands on the steering wheel and was staring straight ahead.[2] When Gonzales neared the main gate and realized it was closed, he turned and the truck flipped on its side.

---

[2] Gonzales' aunt, Maria Mahram, also went to the cemetery after receiving a phone call that Gonzales had gone there to kill himself. She also testified that Gonzales had both hands on the steering wheel.

## C.    *Gonzales' Interview*

Deputy Claudia Iwasczyszyn interviewed Gonzales on February 8.  Gonzales waived his *Miranda*[3] rights.  Gonzales told Deputy Iwasczyszyn that he tried to communicate with the cleaning "ladies" in broken Spanish.  He had his gun in his hand.  He explained he had taken it out of the house because it was not locked up and his children were at home.  He went to his mother's gravesite to kill himself, but after a while he changed his mind.  He looked for the keys to his truck but was unable to find them.  He returned to his truck and got his gun.  At that point, he just wanted to go home and needed to find a vehicle.  Gonzales told Deputy Iwasczyszyn that he had consumed two vodka shooters and half a pint of vodka.

## D.    *Gonzales' Testimony*

Gonzales testified that his mother's cancer diagnosis was very hard on him, and his grandfather's death was even worse.  He felt suicidal because he knew his mother would die too, so he drank some detergent to kill himself.  When Sampson moved out of the house, Gonzales felt abandoned, alone, and depressed.  His drinking increased to about a quart of vodka a day.  After his mother died, he visited her grave twice a week and on weekends.  He would bring a bottle of alcohol with him, sit and talk to his mother, and drink.

On February 7, 2011, the day before his mother's birthday, he went to her gravesite to kill himself with his grandfather's gun, which he had taken from his grandfather's safe.  He drank a few vodka shots and then stopped at the store for more vodka.  He drank another quart of vodka and ingested some cocaine before he arrived at the cemetery at about 6:30 p.m.  He sat by his mother's grave crying, drinking, and using cocaine.  Nicole called, and he told her where he was and that he had left a note for her.  Then he hung up on her.  He put the gun to his head, told his mother he loved her and

---

**3**    *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

hoped she would not be mad at him, and pulled the trigger. Nothing happened, and he realized the gun was not loaded. At that point he became frightened because he could have died. He was crying, he could not find his keys in the dark, and he wanted to go home.

Gonzales saw a vehicle coming up the hill and ran toward it to try to flag it down. He was screaming for help and waving his arms in the air. He did not remember having the gun in his hand. After the vehicle drove away, he ran toward a building where there were people. He approached them and told them in English he had lost his keys and needed help. One of the women told him in English that the keys were in the truck.[4] Gonzales could not remember whether the gun was in his hand or his waistband at that time. He thought that the woman had given him permission to take the truck, so he got in. He remembered that the gun was poking him in the stomach, so he took it out of his waistband and placed it on the seat. He started the truck and began driving down the hill. The truck was going very fast, and even with both hands on the steering wheel he almost lost control of the truck. He remembered crashing and the truck flipping over.

Gonzales got out of the truck and heard someone telling him to put his hands up. He put his hands up; he did not remember pointing his fingers like guns. Sheriff's deputies grabbed him, and the next thing he remembered he was riding in an ambulance with someone telling him he was going to the hospital.

Gonzales did not remember telling Deputy Iwasczyszyn that he tried to talk to the cleaning ladies in broken Spanish. He acknowledged that he had lied to her about how much alcohol he had consumed and about taking the gun with him for safekeeping because he did not want to get into any more trouble.

---

**4** Gonzales recalled the people he spoke to were both women, even though Aguirre testified that he was one of the people who spoke with Gonzales.

E.    *Expert Testimony*

Psychiatrist Ronald Markman testified about the effects of alcohol on a person's thoughts, judgment, and memory, as well as the ability to appreciate the consequences of the person's behavior.  He also testified about the effects of cocaine on a person's thought processes.  He discussed the effects of depression and grief.  He noted that the combination of alcohol, drugs, and depression can significantly impair a person's awareness of what he or she is doing and can also result in amnesia about events.

**PROCEDURAL BACKGROUND**

The People charged Gonzales by information with two counts of robbery (Pen. Code, § 211) and two counts of carjacking (*id*., § 215, subd. (a)) committed against Robledo and Aguirre.  The People also alleged pursuant to Penal Code section 12022.53, subdivision (b), that Gonzales used a firearm in the commission of the crimes.  They further alleged that these offenses were serious and violent felonies within the meaning of Penal Code sections 1192.7 and 667.5, which would make them "strikes" for purposes of the "Three Strikes" law.  (*Id*., §§ 667, subd. (d)(1), 1170.12, subd. (b)(1).)  The People also charged Gonzales with one count of exhibiting a firearm in the presence of an officer (*id*., § 417, subd. (c)).

At an August 15, 2011 hearing before Judge Lori Ann Fournier, the court noted its understanding that the prosecution had offered Gonzales a five-year prison term in exchange for a plea to one count and dismissal of the special allegations regarding firearm use and the strikes.  The court told Gonzales it would allow him more time to consider the offer.  The court stated:  "I understand what you were going through at the time, but there is no way any judge can do any better than that if you are convicted of the charges and allegations because we can't, we believe, strike these gun allegations, and that's the problem.  And there is no way I can offer you anything better, or any other judge.  If you are convicted of all of this, it's going to be double digits in state prison.  And I understand the sympathies.  I understand what you were going through at the time,

8

but that doesn't change how a jury will look at it in light of the facts that the victims didn't know you had a[n un]loaded gun, didn't know what you were going through, and were probably scared out of their minds when you confronted them. So you have to think about this offer seriously. It's a terrible case, I understand. And that's why I asked the prosecutor to ask his supervisor if he could do any better than the original offer of 12 years. And they agreed to lower it to the five, but they won't do anything better than that. And I can't legally do anything better than that."

At the next hearing, on October 21, 2011, before Judge Thomas McKnew, the court commented that the five-year offer was very fair. The court told Gonzales, "I don't know, young man, what your thoughts are, but if you're found guilty, . . . not only will you incur strikes, but the sentence—particularly the weapons enhancements—will cause a substantial amount of time that the court may impose, and I will not consider sympathy. I'm telling you that." The court observed, "This would be the last time I'll bring this up, but I do believe, Mr. Gonzales, that you're a young man and you have a lot of life to live . . . , but you are taking a very serious risk in the view of this court by not accepting the offer that was made to you. I cannot dismiss by law the charges, and I must apply the gun enhancements . . . if found to be true, you're looking at a very long sentence, sir, versus five years and two strikes if you continue to—as you had prior to this incident— live a wholesome life." The court suggested "before I have the jury come out here, that you talk to your counsel and use some judgment and reasoning. If your judgment and reasoning is to proceed with the trial, we're proceeding with this trial."

Counsel for Gonzales, Ted T. Yamamoto, asked the court if Gonzales' family could speak with him. The trial court gave permission and asked the prosecutor to verify that the five-year offer was still open. Yamamoto asked if the court could offer one strike instead of two. The court said it could not because of the seriousness of the offenses, and, in any event, the court did not believe it had authority to do so. The prosecutor checked with her supervisor and reported that the offer was now seven years. Yamamoto conferred with Gonzales and reported that Gonzales wanted to proceed with the trial.

9

After the jury convicted Gonzales, he retained new counsel who filed a motion for new trial or, in the alternative, an order that the prosecution offer a five-year plea deal. The motion was based on ineffective assistance of counsel. In his supporting declaration Gonzales explained that he now realized it was a mistake to reject the prosecution's offers. He "never intended to proceed to trial, but did so after discussions with Mr. Yamamoto." He explained that "[a]t some point after the five year offer and subsequent [seven] year offer were conveyed to me, Mr. Yamamoto specifically told me he had a dream, and believed he could, 'win the case.' Mr. Yamamoto also specifically and expressly told me that if a jury convicted me at trial, the court would not sentence me to more than five or six years. . . . Based on these statements, and nothing else, I rejected the plea offer and decided to proceed to trial."

Gonzales acknowledged that the court had advised him of the consequences of rejecting the plea offers but stated that he did not "completely understand" the court's comments, and the court never asked him if he understood the comments. According to Gonzales, Yamamoto never advised him that if he were convicted and the use allegations found true, "the 10 year sentence for the firearm allegation had to be imposed. He never advised me that the firearm allegation could not be stricken or stayed by the sentencing judge. Had he done so, I would have accepted the prosecution's five year offer." Rather, "Mr. Yamamoto specifically told me that once the Court and prosecutor heard 'my story' at trial, and if I was convicted, I would not be sentenced to a term of imprisonment greater than five or six years."[5]

At the hearing on the motion bailiff James Rodriguez testified that he overheard the conversation between Gonzales and his family in the presence of Yamamoto after the prosecution offered Gonzales seven years. Frank Gonzales said, "'Well, you might as well go to trial now. You're not going to get any more time.'" According to Rodriguez, "Mr. Yamamoto appeared to agree," but Rodriguez did not hear him say anything in

---

[5] Nicole Gonzales, Frank Gonzales, and Sampson submitted declarations that were consistent with Gonzales' declaration.

response. During the conversation, Rodriguez heard Yamamoto say, "'Let's go to trial,'" and Rodriguez told Gonzales, "'You have to do the time, not your attorney.'" Rodriguez also testified that Yamamoto told him he had a dream he could win the case.

On cross-examination Rodriguez acknowledged he did not know if Yamamoto heard Frank Gonzales' statement. He testified that he never heard Yamamoto tell Gonzales that the maximum sentence he would receive would be six or seven years. However, Yamamoto told Rodriguez during a break in the proceedings "in essence, 'if he's convicted, he's not going to do the time.' And [Rodriguez] said, 'It's a 10-year gun enhancement; he has to.' And he goes, 'I believe you can stay it,' or something like—in [those] words, and I looked, and I said, 'I'm thinking you're wrong, but I'm no lawyer.'"

According to Rodriguez, Gonzales' "family originally, I could tell, didn't want the five. It seemed like when [the prosecutor] came back with the seven, they definitely were surprised. [Gonzales] asked me at that point, 'What would you do?' [Rodriguez] told him, 'You're about as old as my son. I told you to take the five. I would tell you, if you were my kid, to take the seven.'" After that, Yamamoto talked to Gonzales and told the court they were going to trial.

Deputy district attorney Michael Enomoto also testified at the hearing on the motion for a new trial. Enomoto stated that Yamamoto approached him seeking "an offer in the low single digits." Enomoto and the head deputy told Yamamoto that if Gonzales went to trial, he faced a statutory minimum of 12 to 13 years because of the gun enhancement. They offered to strike the gun use enhancement to give Gonzales "five years at 85 percent."

The trial court noted that two judges had advised Gonzales "that he would be facing a higher sentence than five or seven years" if he were convicted. The court did not know whether Yamamoto actually thought he could get Gonzales a sentence of five or six years after trial. The court, however, "believe[d] the defendant was fully advised and appraised of the consequences of a guilty verdict to the carjackings." Both the trial judge and Judge Fournier told Gonzales that the firearm use enhancements could not be stricken and Gonzales faced a double digit sentence if convicted. "The court believe[d]

11

that [Gonzales] thought that for some reason—or his attorney along with [Gonzales] thought for some reason—that the sympathies . . . did lie in the favor of [Gonzales].  And there may have been a jury that, notwithstanding the law, thought that the jury could or would find [Gonzales] not guilty."

The court found this case distinguishable from recent United States Supreme Court cases.  The court noted that granting the motion "would be enlarging the decisions of those courts and, in essence, giving defendants" incentive to "go to trial and take [their] chances to see whether the jury will nullify the law and the facts presented, and if that [did not] work," make a new trial motion and try to get the pretrial offer.  The court therefore denied the motion.  The court sentenced Gonzales, and he timely appealed.

### DISCUSSION

A.      *Standard of Review*

Gonzales asserts that we must "undertake an independent review of the record," citing *In re Alvernaz* (1992) 2 Cal.4th 924, 944-945, *In re Hochberg* (1970) 2 Cal.3d 870, 876-877, and *In re De La Roi* (1945) 27 Cal.2d 354, 365.  He fails to recognize, however, that review of a claim of ineffective assistance of counsel on appeal is different from review of the same claim on a petition for writ of habeas corpus, as in *Alvernaz*, *Hochberg*, and *De La Roi*.

As explained in *People v. Vines* (2011) 51 Cal.4th 830, courts reviewing claims of ineffective assistance of counsel on appeal "'defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.]  Defendant's burden is difficult to carry on direct appeal, as we have observed:  "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'"  [Citation.]'  [Citation.]  If the record on appeal ""'sheds no light on why counsel acted or

12

failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected,'" and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*Id*. at p. 876; *People v. Ledesma* (2006) 39 Cal.4th 641, 746; see *People v. Gray* (2005) 37 Cal.4th 168, 211 [rejecting claim of ineffective assistance of counsel because it "is more appropriately raised in a petition for a writ of habeas corpus"].)

      B.      *Ineffective Assistance of Counsel in Plea Bargaining*

The recent Supreme Court cases to which the trial court referred are *Lafler v. Cooper* (2012) ___ U.S. ___ [132 S.Ct 1376, 182 L.Ed.2d 398] and *Missouri v. Frye* (2012) ___ U.S. ___ [132 S.Ct. 1399, 182 L.Ed.2d 379]. In *Lafler*, the Supreme Court confirmed a defendant's Sixth Amendment right to counsel extends to plea bargaining, and that "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." (*Lafler v. Cooper*, *supra*, 132 S.Ct. at p. 1387.) The Supreme Court held that under the two-part test established in *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] a defendant claiming ineffective assistance of counsel during the plea bargaining process must show """"counsel's representation fell below an objective standard of reasonableness"""" and "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Lafler v. Cooper*, *supra*, 132 S.Ct. at p. 1384, quoting *Strickland*, *supra*, at pp. 688, 694.) The court noted that "[i]n the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." (*Lafler v. Cooper*, *supra*, 132 S.Ct. at p. 1384.) The court concluded that to prove the ineffective advice caused the defendant to reject a plea offer, "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would

13

have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." (*Id*. at p. 1385.)[6]

In *Missouri v. Frye*, *supra*, 132 S.Ct. 1399 the Supreme Court, following *Lafler*, stated that "[t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel.  Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law.  To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. [Citation.]" (*Id.* at p. 1409.)  The court noted that "[t]he prosecution and trial courts may adopt some measures to help ensure against late, frivolous, or fabricated claims after a later, less advantageous plea offer has been accepted or after a trial leading to conviction with resulting harsh consequences." (*Id*. at pp. 1408-1409.)[7]

The California Supreme Court addressed the issue of ineffective assistance of counsel in the context of plea bargaining in a case similar to this one, *In re Alvernaz*,

---

[6]    In *Lafler*, the prosecution twice offered to dismiss two of the four pending charges against the defendant and to recommend a sentence of 51 to 85 months on the other two charges, in exchange for a guilty plea.  The defendant initially admitted guilt and indicated that he would accept the offer but later rejected it, allegedly because of his attorney's representation that the prosecution would be unable to prove its case.  The defendant also rejected a significantly less favorable offer on the first day of trial.  He was convicted and sentenced to 185 to 360 months. (*Lafler v. Cooper*, *supra*, 132 S.Ct. at p. 1383.)

[7]    In *Missouri v. Frye*, the court held that by failing to communicate the plea offers, defense counsel deprived the defendant of the effective assistance of counsel. (132 S.Ct. at p. 1408.)

14

*supra*, 2 Cal.4th 924. In *Alvernaz* the court considered the question of "under what circumstances, if any, a criminal defendant who rejects an offered plea bargain prior to trial and thereafter is convicted and receives a sentence less favorable than the terms of the offer, may challenge that conviction and sentence on the ground of ineffective assistance of counsel in the decision to reject the offered plea bargain." (*Id*. at p. 928.) The court concluded "that when a defendant demonstrates that ineffective representation at the pretrial stage of a criminal proceeding caused him or her to proceed to trial rather than to accept an offer of a plea bargain that would have been approved by the court, the defendant has been deprived of the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution, even if the defendant thereafter receives a fair trial." (*Ibid*.)

The court held that in order to establish ineffective assistance of counsel the defendant "must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; *and* (2) counsel's deficient performance subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*In re Alvernaz*, *supra*, 2 Cal.4th at pp. 936-937.) The defendant can satisfy the second prong by showing a reasonable probability that, absent the deficient representation, the defendant would have accepted the proffered plea bargain and it would have been approved by the court. (*Id*. at p. 937.) The court also "note[d] the ease with which a defendant, after trial, may claim that he or she received inaccurate information from counsel concerning the consequences of rejecting an offered plea bargain. 'It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . .' (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689 . . . .) . . . Thus, in reviewing such a claim, a court should scrutinize closely whether a defendant has established a reasonable probability that, with effective representation, he or she would have accepted the proffered plea bargain." (*Id*. at p. 938, fn. omitted.)

15

The *Alvernaz* court stated that, "[i]n determining whether a defendant, with effective assistance, would have accepted the offer, pertinent factors to be considered include: whether counsel actually and accurately communicated the offer to the defendant; the advice, if any, given by counsel; the disparity between the terms of the proposed plea bargain and the probable consequences of proceeding to trial, as viewed at the time of the offer; and whether the defendant indicated he or she was amenable to negotiating a plea bargain.  In this context, a defendant's self-serving statement—after trial, conviction, and sentence—that with competent advice he or she *would* have accepted a proffered plea bargain, is insufficient in and of itself to sustain the defendant's burden of proof as to prejudice, and must be corroborated independently by objective evidence.  A contrary holding would lead to an unchecked flow of easily fabricated claims." (*In re Alvernaz*, *supra*, 2 Cal.4th at p. 938.)  An additional factor noted by the court "may be the defendant's stance at trial.  For example, a defendant's trial protestations, under oath, of complete innocence may detract from the credibility of a hindsight claim that a rejected plea bargain would have been accepted had a single variable (sentencing advice) been different." (*Id.* at p. 940.)[8]

---

[8]    In *Alvernaz*, the defendant claimed that his trial counsel told him that he thought he had a 70 to 80 percent chance of winning the case, and that if the defendant were convicted, the maximum sentence would be about eight years, with a "net" sentence of about four years. (*In re Alvernaz*, *supra*, 2 Cal.4th at pp. 930-931.)  The defendant claimed that had he been properly advised, he would have accepted the offer and received a substantially lesser sentence. (*Id.* at p. 930.)  Trial counsel submitted a declaration stating that the defendant maintained his innocence and refused to accept the plea offer, but acknowledged that he might not have correctly informed the defendant of the maximum sentence he could receive. (*Id.* at p. 931.)  The court concluded that the defendant "failed to establish a reasonable probability that, had he accurately been informed of his potential life sentence and prison confinement for 16 years and 7 1/2 months prior to parole, he would have accepted the plea bargain offered.  [His] statement in his most recent declaration that, had he been given adequate advice, he would have accepted the plea offer, is self-serving and thus insufficient in and of itself to establish prejudice.  [Citation.]" (*Id*. at p. 945.)

16

C.    *Application to This Case*

There is evidence in the record supporting Gonzales' claim that Yamamoto gave him erroneous advice during the plea bargaining process. Gonzales stated in his declaration that Yamamoto "specifically and expressly told me that if a jury convicted me at trial, the court would not sentence me to more than five or six years." There is no evidence that Yamamoto ever advised Gonzales that if he were convicted and the use allegations found true, "the 10 year sentence for the firearm allegation had to be imposed." Gonzales stated that Yamamoto never advised him "that the firearm allegation could not be stricken or stayed by the sentencing judge." Consistent with Gonzales' declaration, Rodriguez testified that Yamamoto told him that if Gonzales were convicted, "'he's not going to do the time.'" When Rodriguez pointed out that the 10-year gun use enhancement was mandatory, Yamamoto expressed a belief that it could be stayed. Gonzales also stated that "Mr. Yamamoto specifically told me he had a dream, and believed he could, 'win the case.'"

Erroneous advice, however, is not enough to establish ineffective assistance of counsel. (See *In re Alvernaz*, *supra*, 2 Cal.4th at pp. 930-931, 945.) As discussed above, Gonzales must show that "the outcome of the plea process would have been different with competent advice." (*Lafler v. Cooper*, *supra*, 132 S.Ct. at p. 1384.) Gonzales must show that there is a reasonable probability he would have accepted the plea offer, the prosecution would not have withdrawn it in light of intervening circumstances, and the court would have accepted it. (*Id.* at p. 1385; *Missouri v. Frye*, *supra*, 132 S.Ct. at p. 1409; *In re Alvernaz*, *supra*, at p. 937.)

While the prosecution withdrew its original five-year plea offer, it offered seven years immediately prior to trial. The trial court not only indicated that it would approve the plea bargain, the court encouraged Gonzales to accept it. The court told him, "you

17

are taking a very serious risk in the view of this court by not accepting the offer that was made to you."**9**

Gonzales' self-serving declaration that he would have accepted the plea offer is insufficient to establish a reasonable probability that he would have done so. (*In re Alvernaz*, *supra*, 2 Cal.4th at p. 938.) Two different judges at two different times unambiguously advised Gonzales that if he proceeded to trial and were convicted, he would receive a longer sentence, and that imposition of the firearm use enhancement was mandatory. Gonzales acknowledged that the court advised him of the consequences of rejecting the plea offers but argues that he did not "completely understand" the court's comments. This is the type of after-the-fact statement both *Frye* and *Alvernaz* warned against. (See *Missouri v. Frye*, *supra*, 132 S.Ct. at pp. 1408-1409; *In re Alvernaz*, *supra*, at p. 938.) Gonzales did not specify what he did not understand about the two advisements he received. He merely complained that the judges never asked him whether he understood the advisements.

Moreover, the court allowed Gonzales to speak to his family before making his final decision. Rodriguez testified he overheard the conversation between Gonzales and his family after the prosecution made the seven-year offer, and it appeared that Gonzales' family "didn't want the five," let alone seven years in prison. This evidence, which suggests that Gonzales' family wanted him to reject the offer, along with the advisements of two judges (and a bailiff) about the risks of rejecting the offer, suggests there may have been other factors in play besides Yamamoto's advice that led to Gonzales' decision to proceed to trial. (See, e.g., *In re Alvernaz*, *supra*, 2 Cal.4th at p. 945 [evidence, "and the reasonable inferences drawn therefrom, establish that petitioner's decision to reject the plea offer was motivated primarily by a persistent, strong, and informed hope for

---

**9** The People argue only that Gonzales failed to prove "that the five-year plea offer would have actually been implemented, i.e., there would have been no change-of-heart by the judge and/or prosecutor." Because at the start of trial the prosecutor offered and the court indicated it would approve a seven-year plea deal, the only issue before us is Gonzales' willingness to accept the seven-year offer.

18

exoneration at trial, and that any evaluation of precise sentencing options was secondary in his thinking"].)

The absence of a declaration from Yamamoto regarding Gonzales' rejection of the plea offers makes it impossible for this court to evaluate Gonzales' claim of ineffective assistance of counsel. (Cf. *In re Alvernaz*, *supra*, 2 Cal.4th at p. 931 [trial counsel submitted declaration stating that the defendant maintained his innocence and refused to accept the plea offer]; *People v. Curry* (1997) 178 Ill.2d 509, 532 [687 N.E.2d 877] ["defense counsel's affidavit provides independent, objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice, and not, as the State suggests, upon other considerations"].) His claim therefore "'is more appropriately decided in a habeas corpus proceeding.'" (*People v. Vines*, *supra*, 51 Cal.4th at p. 876; *People v. Ledesma*, *supra*, 39 Cal.4th at p. 746.) As explained in *Rose v. Superior Court* (2000) 81 Cal.App.4th 564: "Claims of ineffective assistance more often lend themselves to resolution in an evidentiary hearing" on habeas corpus. (*Id.* at p. 575.) The "evidentiary hearings afford counsel the opportunity to present live testimony, examine former defense counsel, orally argue the case, and respond to any concerns by the court. [Citations.]" (*Ibid.*; see *People v. Witcraft* (2011) 201 Cal.App.4th 659, 665 ["a claim of ineffective assistance is generally rejected on direct appeal and more properly raised in a petition for habeas corpus, which can include declarations and other information outside the appellate record that reveal the reasons for the challenged conduct"].)

## DISPOSITION

The judgment is affirmed.

SEGAL, J.*

We concur:

PERLUSS, P. J.

ZELON, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.